## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STEVEN R. SYRJA** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | |
| | * | **Civil No. PJM 09-1956** |
| **WESTAT, INC.** | * | |
| | * | |
| **Defendant** | * | |

## OPINION

Steven Syrja has sued his former employer, Westat, Inc. ("Westat"), alleging violations

of the Family and Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act of 1964

("Title VII"), the Fair Labor Standards Act ("FLSA"), and the Maryland Wage Payment and

Collection Law. With respect to his FLSA claim, Syrja has also filed a Motion for Conditional

Class Certification [Paper No. 14], in which, pursuant to 29 U.S.C. § 216(b), he asks the Court to

conditionally certify a class of current and former Westat employees who were allegedly denied

compensation for hours worked in excess of 40 in a given work week. Westat opposes the

Motion.

For the following reasons, the Court **DENIES** Syrja's Motion for Conditional Class

Certification [Paper No. 14], as well as his Supplement to Motion for Conditional Class

Certification [Paper No. 23].

## I.

For present purposes, the facts are taken to be as follows:

Westat is a Rockville, Maryland-based statistical survey research company that collects

and analyzes data on various subjects for government agencies, businesses, and foundations.

Since the 1980s, the federal Centers for Disease Control and Prevention ("CDC") have engaged

Westat to assist with the collection of medical data for its National Health and Nutrition

Examination Surveys ("NHANES"). The NHANES project, which endeavors to provide a

statistical snapshot of the baseline health of Americans, requires that annual data be collected at

several thousand selected households throughout the country. The data collected through the

NHANES project eventually serve as a source for health science study and analysis for federal

agencies, universities, and other public and private research entities.

To facilitate the collection of data for NHANES, Westat employs "field interviewers"—

also sometimes referred to as "data collectors"[1]—whose job is to visit households selected by

NHANES statisticians to request their participation in the study and to collect information about

the background and health of the households' members. To administer the data collection

process, Westat establishes temporary offices in specified geographic locations, usually for a

period of eight to ten weeks. Each such location is referred to as a "stand," and each stand is

typically staffed by a study manager, a field manager, an office manager, an assistant office

manager, a facilities specialist, and several field interviewers. When the data collection process

for a given stand is complete, that stand's field personnel travel to the next designated stand and

reestablish temporary offices to begin the data collection process anew. Each year, the NHANES

project collects data from approximately 15 stands throughout the country, with three stands

typically operating simultaneously at any given time.

Westat's NHANES field interviewers work at the stands for approximately 48 weeks

each year. They receive two vacation breaks—one in the summer and another in the winter—

lasting approximately two weeks each. Given that the interviewers must work at several different

stands each year, the job requires travel on a full-time basis. The interviewers stay in hotels or

---

[1] From here forward, the Court's use of the term "field interviewers" will encompass both "field interviewers" and "data collectors."

apartments in the general vicinity of their assigned stands and receive per diem allowances to cover expenses for meals and incidentals.

After arriving at a stand, each field interviewer receives materials containing addresses and basic information for households that have been identified as possible candidates for the NHANES study. Each field interviewer travels to each address assigned to him, greets the person who answers the door, and describes the purpose of the NHANES project. The field interviewer then conducts a "household screening," a process through which he collects demographic data about the people in the household, enters the data in a portable computer, and receives feedback from the computer indicating whether one or more candidates for the NHANES study resides in the household. If at least one such candidate is identified, the field interviewer attempts to persuade the candidate(s) to submit to a comprehensive health interview, to be followed by a medical examination to be conducted by a different group of Westat personnel.

To a significant degree, Westat's NHANES field interviewers set their own work schedules. Although they are obliged to report to their respective stand offices a few times each week, it is generally up to the interviewers to decide when to begin their work days, decide when to take breaks, determine their own daily and weekly travel itineraries, and decide when to end their respective work days.

The quantity and nature of work assignments among field interviewers vary considerably. Some interviewers are assigned as few as 20 households in a stand, others as many as 100. The variations depend upon the geography of the stand, the resulting time travel required, the preferences of the stand's managers, and the skill and experience levels of the field interviewers, among other things. The complexity of a given interview also varies from household to household.

Because they generally work alone in the stands and largely set their own schedules, the interviewers are responsible for recording and reporting their work hours. To facilitate the reporting process, Westat provides each field interviewer with blank timesheets. On a weekly basis, each field interviewer records his or her work hours on a timesheet and submits the timesheet to his study manager for approval. Once the timesheet is approved, the study manager delivers the timesheet to Westat's payroll department for processing.

Putative class representative Syrja worked as a Westat field interviewer on the NHANES project from January 2005 to January 2008. In his Second Amended Complaint [Paper No. 39], he alleges that, while at Westat, he regularly worked more than 40 hours in a given week, but that Westat never compensated him for his overtime hours at his regular rate of pay or at a premium overtime wage rate. The reason, Syrja says, is because Westat personnel explicitly directed him not to report more than 40 hours in a given work week, irrespective of the number of hours he actually worked. He further maintains, both in his Second Amended Complaint and in his Motion for Conditional Class Certification, that numerous other Westat field interviewers were similarly denied overtime compensation and were similarly directed not to report more than 40 hours on a weekly time sheet, irrespective of the number of hours they actually worked.

Adding to the complexity of this case is Syrja's acknowledgment that not only did he never record more than 40 hours on a weekly timesheet;[2] he also never maintained separate records of the number of hours he actually worked.[3] Indeed, there is no indication that *any* of the field interviewers who did not report more than 40 work hours per week ever maintained

---

[2] Syrja, of course, maintains that he never recorded hours in excess of 40 on his timesheets because Westat personnel specifically directed him not to do so.

[3] In his Second Amended Complaint, Syrja says of himself: "Although Plaintiff did not keep daily written records of the hours he worked for Westat, his best estimate is that for the duration of his employment with Westat he worked, on average, 48 hours per week, of which eight (8) hours were overtime hours."

separate records of the excess hours that they purportedly worked.[4] These considerations are

clearly problematic. The determination of liability in this case—as well as the calculation of

damages, should the Court or a jury ultimately find in favor of Syrja—would require a complex

reconstruction not only of Syrja's work hours, but also of those of each member of the proposed

class.

While Westat concedes that its field interviewers are "non-exempt" employees who

would otherwise be entitled to overtime compensation under the FLSA, it denies that it ever

failed to compensate field interviewers for overtime hours or directed them not to report hours

worked in excess of 40 in a given week. Indeed, Westat asserts that, much to the contrary, its

express policy is to pay its employees for all overtime hours worked, at 1.5 times the normal rate

of pay, even when overtime hours are not approved in advance as required by company rules.[5]

**II.**

Under the FLSA, a plaintiff may bring an action on behalf of himself and other

employees, provided that the other employees are "similarly situated" to the plaintiff: "An action

to recover the liability prescribed in [this subsection] may be maintained against any employer . .

. in any Federal or State court of competent jurisdiction by any one or more employees for and in

behalf of himself or themselves and other employees *similarly situated*." 29 U.S.C. § 216(b)

(emphasis added). In deciding whether to certify a collective action under the FLSA, courts

generally follow a two-stage process. In the first stage, sometimes referred to as the "notice

---

[4] In the declarations submitted by Syrja, the putative class members assert that, like Syrja, they were unlawfully denied overtime compensation by Westat, but do not refer to independent recordkeeping of their hours.

[5] According to the official Compensation and Overtime Policies document submitted by Westat, field interviewers are not authorized to work overtime "without prior supervisor approval," and may be subjected to discipline for working overtime hours without such approval. However, the document also states that field interviewers "will be paid for all hours reported in a timely manner, including all overtime hours," even when such hours are unauthorized. A similarly-worded policy statement appears in Westat's Employee Timesheet Guide for Traveling Staff.

stage," the court makes a threshold determination of "whether the plaintiffs have demonstrated that potential class members are 'similarly situated,'" such that court-facilitated notice to the putative class members would be appropriate. *Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000). In the second stage, following the conclusion of discovery, "the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] 'similarly situated' in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action." *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007). This second stage, which typically begins when the defendant files a motion for decertification, is sometimes referred to as the "decertification stage." *See id.*

Determinations of the appropriateness of conditional collective action certification and court-facilitated notice are left to the court's discretion. *See Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 563 (E.D. Va. 2006); *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 893 (D. Md. 1995). Although plaintiffs need only put forward "relatively modest" evidence that they are similarly situated in order to obtain approval to proceed as a class, *see D'Anna*, 903 F. Supp. at 894, "[w]hen sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, . . . a court can . . . deny certification outright," *Purdham v. Fairfax County Pub. Sch.*, 629 F. Supp. 2d 544, 547 (E.D. Va. 2009). In particular, a court may determine that conditional certification is inappropriate where multiple claims cannot be adjudicated efficiently because they would require "substantial individualized determinations for each class member." *See Purdham*, 629 F. Supp. 2d at 549; *see also England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (finding conditional certification inappropriate where adjudication of a collective action would have required factual inquiries into employment relationships involving different managers at different geographic locations

throughout the country, and where the court concluded that a finding of liability at one location would not necessarily lead to a finding of liability at another location).

## III.

In his Motion for Conditional Class Certification, Syrja argues that conditional certification is appropriate in this case because he and the putative class members are all similarly situated. He contends that all members of the putative class: (1) are, as is he, current or former Westat field interviewers or data collectors; (2) were, as was he, subjected to the same illegal pay practice—namely, a refusal to provide appropriate compensation for hours worked in excess of 40 in a single week; and (3) seek, as does he, overtime compensation for time worked "off the clock" over the course of the past three years. Syrja further argues that the Court should equitably toll the statute of limitations as to certain potential class members because of "delays" resulting from prior stages of this litigation.

Westat argues that: (1) Syrja's assertions that he and the members of the putative class are similarly situated are mere conclusory allegations insufficient to make the required showing of commonality even under the "relatively modest" standard articulated in the cases; (2) Syrja's own deposition testimony refutes his allegation that Westat field interviewers perform their jobs in the same manner; (3) Syrja cannot demonstrate that the putative class members were subjected to a uniform policy that violated the FLSA; and (4) he cannot demonstrate that this case is manageable as a collective action. Westat also opposes Syrja's request for equitable tolling.

## IV.

The Court agrees with Westat that conditional certification is not appropriate in this case.

There is no question but that adjudication of the multiple claims in this case would require "substantial individualized determinations for each class member." *See Purdham*, 629 F.

Supp. 2d at 549. Syrja's own deposition testimony demonstrates that each Westat field interviewer sets his "own schedule"; that case assignments "vary between field interviewers" and from "stand to stand" and from "manager to manager"; that household assignments can vary in an "infinite" number of ways; and that the amount of time required to conduct a household interview varies greatly from household to household. Syrja also concedes that, because neither he nor the other members of the putative class maintained independent records of their work hours, the determination of liability and the calculation of damages in a collective action would require speculative reconstruction, using notes and computer entries made during household screenings, of each individual putative class member's work hours.[6] Moreover, aside from his own assertions and those of members of the putative class, Syrja has offered no evidence that even begins to suggest that Westat currently maintains, or that it ever maintained, a uniform national policy of denying appropriate compensation for employee hours worked over 40 in a given week.[7] In fact, the only concrete evidence before the Court relevant to a national policy with respect to overtime pay is Westat's official policy to the effect that it will compensate its employees for all overtime hours worked, even when such hours are unauthorized.[8]

---

[6] In his deposition, Syrja conceded that his field interview notes generally do not indicate how much time he spent at a given household. Thus, the reconstruction of his work hours—and the work hours of the other members of a certified class—would require a complex, individualized analysis of interview notes, along with a comparison of those notes to computer records from the field interviewers' portable computer entries. Notably, putative class member Barry Smith conceded in his testimony that even a complex analysis of household screening notes and computer entries would not permit a full reconstruction of work hours, since "[s]ome people didn't take as good of notes as others" and "we do a lot of work without the computer ever being turned on."

[7] Other courts have concluded that "unsupported assertions of widespread violations are not sufficient to meet [a] plaintiff's burden" under section 216(b). *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003); *see also Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983).

[8] In fact, as Westat notes, Syrja's deposition testimony runs counter to his contention that Westat maintained a widespread policy against compensation for overtime hours. According to that testimony, during Syrja's three years of employment with Westat, there were only two weeks in which he worked uncompensated overtime with actual supervisor knowledge—one week in 2005, and another week in 2006—and as to neither of those timeframes does he contend that any official above the local field manager knew of Syrja's alleged uncompensated overtime. Putative class member Barry Smith has testified that he could not identify any weeks within the limitations period where management was aware that he worked overtime without compensation.

There can be no doubt that, ultimately, the adjudication of multiple claims in this case would require the parties, the Court, and perhaps eventually a jury, to engage in an unmanageable assortment of individualized factual inquiries. At a minimum, these inquiries would require an examination of: each individual field interviewer's work assignments; the nature and length of the assignments; his interactions with his respective managers; the details of how and when he was instructed to complete his timesheets; the notes he took during his household screenings; the computer entries he made during his household screenings; the policies in place regarding hours to be worked in his particular stand(s); whether he was ever authorized to work overtime; and whether he was in fact compensated or uncompensated for his overtime hours[9]—all these things across multiple geographic locations throughout the country, over different time periods, in offices run by different managers—and all this in the absence of any plausible showing by Syrja that a national directive existed that imposed illegal overtime policies on *all* field interviewers irrespective of their individual locations and managers.[10]

---

[9] Syrja's request that the Court equitably toll the statute of limitations on the FLSA claims of as yet unidentified putative class members, so as to relieve them of the consequences of "delays" resulting from prior stages of this litigation, suggests yet another individualized layer of inquiry that would make certification of the class unwieldy. As a rule, unknown prospective plaintiffs in a proposed class action are not entitled to equitable tolling absent a showing of extraordinary or unusual circumstances. *See Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1243-44 (S.D. Ala. 2008) ("The Court deems Plaintiffs' meager showing inadequate to justify application of this 'rare remedy' in these altogether ordinary circumstances. To hold otherwise would be to opine that equitable tolling should be granted in every § 216(b) case as a matter of course during the pendency of a conditional class certification request, thereby transforming this extraordinary remedy into a routine, automatic one."). Here the Court would have to inquire into whether extraordinary or unusual circumstances exist as to each of an indeterminate number of proposed class members.

[10] In the *England* case, the district court expressed nearly identical concerns when it concluded that conditional class certification was inappropriate. *See England*, 370 F. Supp. 2d at 511 ("It is clear that this case involves a multitude of different managers at different geographical locations across the country. It is also clear that individual inquiries must predominate in this case because of the different locations, managers, and factual situations involved at each location. . . . It is also important to emphasize that plaintiffs have failed to provide sufficient evidence of a nationwide illegal policy involving the alleged claims. . . . [The] evidence supports the Court's conclusion that these alleged claims are based on local policies of various managers located at different sites. There is simply no evidence of a national policy that would support a collective action under the facts of this case."). *England*, in a sense, prefigures the elevated plausibility standard recently announced in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-63 (2007).

Simply put, this is not a case that lends itself to the sort of efficient adjudication of multiple

claims by "similarly situated" persons that § 216(b) contemplates. The Supreme Court has noted

that § 216(b) is based on a theory of judicial economy, under which "[t]he judicial system

benefits by *efficient resolution* in one proceeding of common issues of law and fact arising from

the same alleged discriminatory activity." *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165,

170 (1989) (emphasis added);[11] *see also Vondriska v. Premier Mortgage Funding, Inc.*, 564 F.

Supp. 2d 1330, 1333 (M.D. Fla. 2007). To conditionally certify a class in the present case would

not, in the Court's judgment, lead to the "efficient resolution" of the various claims at issue.

　　Despite this, in his supplemental briefing Syrja argues that it is inappropriate for the

Court to consider the question of manageability at the notice stage, and that any concerns

regarding manageability should be deferred until the second stage of the certification analysis—

after the conclusion of discovery. Syrja is certainly correct that some courts have opted to defer

manageability concerns until later stages of the proceedings. *See, e.g.*, *Vondriska*, 564 F. Supp.

2d at 1336 (asserting that "concerns regarding the manageability of the proposed class and

whether the interests of judicial economy will actually be served by a collective action . . . are

more appropriately addressed at the decertification stage when additional information is

available regarding the characteristics of the class"); *Gieseke v. First Horizon Home Loan Corp.*,

408 F. Supp. 2d 1164, 1168 (D. Kan. 2006) (deferring manageability issues to the decertification

stage). It is equally true, however, that other courts have exercised their discretion and have

taken the manageability of a proposed class into account at the notification stage. *See, e.g.*,

*D'Anna*, 903 F. Supp. at 894 ("As a matter of sound case management, a court should, before

offering [to assist plaintiff in locating additional plaintiffs], make a preliminary inquiry as to

---

[11] *Sperling* involved an Age Discrimination in Employment Act ("ADEA") collective action, brought as a § 216(b) action pursuant to the ADEA's express statutory adoption of § 216(b) of the FLSA.

whether a manageable class exists." (quoting *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266-67 (D. Minn. 1991))); *Camper*, 200 F.R.D. at 520 (same); *Purdham*, 629 F. Supp. 2d at 552 (concluding, at the notice stage, that certification would be inappropriate because adjudication of multiple claims would require inefficient, individualized factual inquiries). Ultimately, the significance of manageability concerns at the notice stage is, like other aspects of the conditional certification analysis, a decision for the Court on the facts before it. *See Purdham*, 629 F. Supp. 2d at 548 (noting that the district court has broad discretion to determine whether "a collective action is the appropriate means for prosecuting an [FLSA] action"); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) ("The decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court.").

In the final analysis, the Court concludes that this case—in marked contrast to one involving a group of employees who all work in a single location, in similar positions, under a single management structure—is simply not the type of case that lends itself to efficient resolution on a classwide basis. *See, e.g.*, *Robinson v. Tyson Foods, Inc.*, 254 F.R.D. 97, 102 (S.D. Iowa 2008) (granting conditional class certification in a case involving a group of meat processing workers, all of whom worked in a single location under the same management authority). Instead, if adjudicated on a classwide basis, this case would require a cumbersome, individualized analysis of each class member's particular factual circumstances. *See England*, 370 F. Supp. 2d at 511.

Accordingly, in the exercise of its broad discretion, the Court will **DENY** Syrja's Motion for Conditional Class Certification.

That said, the Court's decision is no way intended to reflect on the merits of Syrja's individual claims, or on those of other current or former Westat employees. This litigation may or may not reveal that Westat unlawfully failed to compensate Syrja for overtime hours. The Court's decision at this juncture is based solely on its conclusion that the multifarious factual differences among the proposed class members make the case an unsuitable candidate for class certification. The merits of Syrja's claims, or those of others, are matters for another day.

**V.**

For the foregoing reasons, Plaintiff's Motion for Conditional Class Certification [Paper No. 14] and Plaintiff's Supplement to Motion for Conditional Class Certification [Paper No. 23] are **DENIED**.

A separate Order will **ISSUE**.

_____/s/_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**November 2, 2010**